Roger COY, Jr., Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 42S00–9803–CR–166.

Supreme Court of Indiana.

Dec. 9, 1999.

Garvin D. Senn, III, Timothy R. Dodd, Evansville, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Roger Coy, Jr. was convicted of murder, Ind.Code § 35–42–1–1, and burglary, Ind.Code § 35–43–2–1. The trial court imposed concurrent sentences of sixty years for murder and ten years for burglary.

Coy's contentions in his direct appeal focus on selection of the jury and admission of autopsy photographs, in particular:

1. Whether the prosecutor committed misconduct when, during voir dire, he:
   a. told the jury that a prosecutor acts as a "minister of justice," or
   b. told the jury that Coy, if convicted, would not be sentenced to death or life in prison, or
   c. advised the court in front of news media that one of its witnesses needed protection from Coy.
2. Whether the trial court erred by admitting two autopsy photographs into evidence.

### Facts and Procedural History

The facts most favorable to the verdict revealed that Dallas Wallace lived alone in a one-room cabin without electricity or running water in Pearl City, an area in Vincennes, Indiana. His income came from government checks, selling scrap metal, and bootlegging liquor. Wallace did not have a bank account; he cashed his checks and carried the money in his billfold, flashing the money around to make sure everyone knew he had it.

On November 22, 1994, Wallace sold some scrap metal for $103.50. He cashed the check and spent $50 to $60 at a liquor store and bar on the way home. At home, he also paid a friend $10 for a box in which he could lock up the beer he had·purchased. This left him with about $45 of the scrap money in his wallet.

That night, Chris Hand took Coy and Milton Lane, Jr. to Pearl City. Hand testified that earlier that evening Coy and Lane discussed robbing Wallace. Hand dropped them off near Wallace's house, and met up with them nearby later that night. As they drove home, Coy told Hand that he and Lane had killed Wallace. Coy produced Wallace's billfold.

A friend of Coy's testified at trial that Coy admitted killing someone in Pearl City. (R. at 1341–42.) He reported that Coy said "he couldn't believe that he took somebody's life for only $45.00." (*Id.*)

Wallace's body was discovered two days after his death, on Thanksgiving day. Police subsequently discovered that he was killed by a single bullet to his brain, and that his billfold was missing.

The State charged Coy and Lane with murder and burglary. They were co-defendants until partway through voir dire, when the court reconsidered Coy's earlier motion for separate trial and granted it.

## I. Prosecutorial Misconduct

### A. Prosecutor as "Minister of Justice".

During voir dire, the prosecutor told prospective jurors that, unlike overzealous prosecutors on television, he was not "out to win," but instead wanted to ensure a fair trial by protecting Coy's constitutional rights. (R. at 301–303, 537–41.) He said that prosecuting attorneys are "ministers of justice," (R. at 304, 538–39), representing the people of the State of Indiana, (R. at 304, 540–41).[1]

Coy's counsel objected to these statements multiple times, and he twice moved to strike the jury panel. The judge denied these motions.[2] After discussing the matter with the prosecutor and the judge out of the hearing of prospective jurors, defense counsel discussed his own role in the proceedings, saying that he saw himself as a seeker of truth like the prosecutor. (R. at 376.) He further said, "I think if the truth comes out we'll be okay." (R. at 377.)

Coy contends that when prosecutors call themselves "ministers of justice" the defendant's lawyer is "by implication, cast in a role subordinate to that of the Prosecutor and rendered suspect to the jury." (Appellant's Br. at 14.)

■■■■ "The function of voir dire examination is not to educate jurors, but to ascertain whether jurors can render a fair and impartial verdict in accordance with the law and the evidence." *Bannowsky v. State,* 677 N.E.2d 1032, 1034 (Ind.1997). A prosecutor's attempt to indoctrinate the jury during voir dire may require reversal if his or her questions amount to misconduct, and if that misconduct subjects the defendant to grave peril. *Bardonner v. State,* 587 N.E.2d 1353, 1357 (Ind.Ct.App. 1992), *trans. denied.* The gravity of the peril is "determined by the probable per-

---

1. The prosecutor made these statements to two panels from which eight of the twelve jurors were chosen:

   We're not here to win.... [P]rosecuting attorneys have taken an oath ... and our oath means that our job is to ensure the fairness and the constitutional rights of these two defendants. We're not here just to win. We're here to ensure that they get a fair and a just trial.... The court's [sic] have said that prosecuting attorneys are really ministers of justice and that the first concern that we have then is not to win the case, but to be fair.... And as ministers of justice we represent. .[.] I mean all lawyers have a client, right? ... The client we have is the people of the State of Indiana. That's who we represent collectively, all the people in the State of Indiana.
   (R. at 302–04.)

2. Counsel also moved for a mistrial at the close of the State's evidence, (R. at 1352, 1429–30), and at the close of Coy's evidence, (R. at 1572–73). The court denied these motions as well. (R. at 1430, 1573.)

suasive effect on the jury's decision, not by the degree of impropriety of the conduct." *Id.*

In *Bardonner,* the prosecutor asked prospective jurors whether they thought that both the State and the defense have an obligation to seek the truth. When a juror responded affirmatively, he told the panelists "that wasn't the law." *Id.* at 1355. He quoted extensively from a dissenting opinion in the U.S. Supreme Court, *United States v. Wade,* 388 U.S. 218, 256–58, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (White, J., dissenting), on the role of prosecutors and defense attorneys. He interspersed his own comments. The prosecutor said that the State's obligation was not to win its case, but to see that justice is done. *Bardonner,* 587 N.E.2d at 1356. The prosecutor also declared that defense counsel need present no evidence, even if he knows the truth, that defense counsel can confuse a witness, even a truthful one, and that our system of justice requires conduct from defense attorneys that in many instances has little if any relation to the search for truth. *Id.*

The Court of Appeals held these statements to be misconduct that placed the defendant in grave peril, stating, "we cannot say that the prosecutor's comments— attacking the integrity of defense counsel by indicating that defense counsel would do anything to hide the truth, including impeaching testimony of truthful witnesses—did not affect the jurors' verdict." *Id.* at 1362. Our Court disapproved of similar statements by a prosecutor in *Miller v. State,* 623 N.E.2d 403, 407 (Ind. 1993).

█ Here, Judge Crowley reviewed defense counsel's objections and motions in light of *Bardonner.* (R. at 687.) He noted that there are two potentially objectionable components to the statements challenged in *Bardonner:* (1) painting prosecutors as

"ministers of justice", and (2) denigrating defense attorneys. (*Id.*) He overruled Coy's objections, because the prosecutor had used only the first *Bardonner* component. (*Id.* at 688.) We agree with Judge Crowley's resolution of this issue.

█ While it is true that prosecutors have special responsibilities set out in Indiana Professional Conduct Rule 3.8,[3] all attorneys are officers of the legal system, Prof. Cond. Preamble, and have a duty of candor toward tribunals, Prof. Cond. R. 3.3. The State argues on appeal that the prosecutor "was seeking to contrast his role with that of prosecutors as portrayed on television," not with that of defense attorneys. (Appellee's Br. at 5 (emphasis omitted).) Regardless of the prosecutor's motive, in the right circumstances such comments might improperly sway a jury in favor of conviction. *See, e.g., Bardonner,* 587 N.E.2d 1353.

While we have disapproved of the technique of reading the *Wade* dissent ("we have scruples, they do not"), it is quite ordinary for both sides in a trial to work at portraying counsel, client, and case in the best possible light. Which of these represent fair or harmless techniques and which are abusive is a call best placed in the hands of trial judges. While Judge Crowley might well have been warranted in curtailing the prosecutor's comments in this case, he did not err in allowing them to stand.

*B. Coy Not Subject to Death Penalty or Life Imprisonment.* The prosecutor told two panels during jury selection that the State had not petitioned for the death penalty or life imprisonment. Coy's counsel objected on the basis that, with the knowledge that neither the death penalty nor a life sentence would be imposed, the jury could "convict a little easier." (R. at 360.) He moved to dismiss the panel and,

---

**3.** Indeed, the prosecutor did not make up the term "ministers of justice." He was quoting from the commentary to this Court's rule on the ethical duties of prosecutors: "A prosecu-

tor has the responsibility of a minister of justice and not simply that of an advocate." Prof. Cond. R. 3.8 cmt.

in the alternative, to discuss the potential penalties with the potential jurors. The Court denied both motions. Counsel then asked whether he could inform the prospective jurors that the penalty in this case would be very serious. The Court agreed to his request. Counsel told the panel that the consequences of a guilty verdict would be "extremely serious." (R. at 369.) Coy now argues that the jury should not have been encouraged to determine guilt or innocence by what it believed to be the appropriate penalty. (Appellant's Br. at 15 (citing *Warfel v. State,* 454 N.E.2d 1218 (Ind.1983)).)

■ Certainly, prosecutors should refrain from discussing penalties with prospective jurors. *Madison v. State,* 534 N.E.2d 702, 706 (Ind.1989). Soon after the 1977 adoption of a new criminal code, we observed: "In performing [its] [g]uilt assessing task, the jury must be oblivious to the legislature's punishment scheme. To hold otherwise, we would be condoning verdicts in which the jury might compromise, to the defendant's benefit or detriment, in order to reach a certain number of years imprisonment." *Debose v. State,* 270 Ind. 675, 676, 389 N.E.2d 272, 273–74 (1979).

■ As with certain other legal rules, however, on this point of procedure death has been "different." We have previously held, for example, that a judge does not err when he informs the jury during voir dire that the defendant is not subject to death, stating:

The penalty prescribed by the Legislature is irrelevant to the jurors in the performance of their 'guilt assessing' duty, and they should be oblivious to the Legislature's punishment scheme since judges rather than juries now fix sentences.... The penalty of death[,] however[,] for the commission of a crime must be recognized as unique and singular. The possibility of the imposition of a death sentence can be an ever present and secretly held concern of prospective jurors in a murder case and as such

might reasonably be expected to improperly influence the manner in which they answer questions on voir dire. It cannot reasonably be said that defendant's subsequent trial was rendered unfair by the remarks of the judge which were calculated to prevent prospective jurors from engaging in improper speculation about the propriety of the death penalty.

*Burgess v. State,* 444 N.E.2d 1193, 1195–96 (Ind.1983).

■ In light of *Burgess,* we conclude that this prosecutor's remarks were not misconduct. The potential jurors merely learned that Coy would *not* receive death or life in prison, rather than learning the entire range of penalties for each of the offenses for which Coy might have been convicted. Thus, the danger that the jurors would compromise on a verdict was slight. Moreover, the benefit derived from the remarks was considerable: a juror's concern that he or she might be asked to impose one of the two harshest penalties permitted in Indiana was thereby alleviated.

Finally, Judge Crowley avoided any prejudicial effect by permitting Coy's counsel to describe the penalty at issue in Coy's case as "extremely serious," (R. at 369), and by instructing the jury that the "judge is solely responsible for assessing the penalty within a broad range of possibilities," (R. at 34). Coy has not shown error.

■ *C. Protective Order.* On the first day of voir dire, three jurors were selected, admonished to completely avoid television, newspaper and radio broadcasts, and sent home. (R. at 408.) The court informed those jurors that they should call the court at 8 a.m. the next morning to determine when their further service would be needed, and that they need not return to the courtroom until summoned. (R. at 406.) Four more jurors were chosen immediately before the lunch break on the second day of jury selection. They were similarly admon-

ished and sent home. (R. at 490–92.) After the jurors left the courtroom, the prosecutor advised the court that one of the State's witnesses might need protection from Coy, who had been released on his own recognizance because the trial had been set beyond the date after which Coy could be legally incarcerated. (R. at 520–03); Ind.Crim. Rule 4(A). Coy's counsel objected because members of the news media were present in the courtroom and "potential jurors that we've already selected ... are out there." (R. at 506; *see also* R. at 503.) Counsel moved to strike the seven jurors already selected on the basis that the prosecutor was attempting to prejudice the jurors via the news media. Judge Crowley denied the motion because (1) no jurors were present in the courtroom when the prosecutor made the statement, (2) the jurors had been admonished to avoid the media, therefore (3) the prosecutor's comment did not prejudice Coy. (R. at 657–59.) We agree.

No jurors, empaneled or prospective, were present in the courtroom when the prosecutor advised the court of the danger to its witness. Judge Crowley had extensively admonished the empaneled jurors to avoid the media. Assuming they followed his instructions, they did not hear the challenged comments. When the next group of prospective jurors were questioned, Coy's counsel could have inquired about their media exposure to the challenged comments, had he believed that they might have learned of the remarks. Coy has presented no evidence that any jurors learned of the prosecutor's remarks about the safety of his witness. Judge Crowley properly denied Coy's motions.

## II. Autopsy Photographs

The court admitted into evidence a six-photograph array of Wallace's body taken at varying stages of the investigation. Two of these were autopsy photographs depicting a dowel rod going through Wallace's skull.

■ "Autopsy photographs are admissible if (1) they provide relevant evidence, and (2) their probative value is not substantially outweighed by their tendency to impassion the jury against the defendant." *Malone v. State*, 700 N.E.2d 780, 783 (Ind. 1998) (citing *Edgecomb v. State*, 673 N.E.2d 1185, 1196 (Ind.1996)). Coy challenges the admission of the photographs on the basis that their probative value is substantially outweighed by the danger of the prejudice they might cause. The State has replied that Coy waived review of this challenge "because his record does not include the photographs he now claims should have been excluded." (Appellee's Br. at 9; *see also* R. at 1000–01.)

■ Coy cites Indiana Appellate Rule 7.2(A)(3)(b) in support of his contention that his argument is not waived. (Appellant's Reply Br. at 3.) That rule provides:

> Physical objects (*except ... pictures and like materials*) which because of their nature cannot be incorporated in the transcript, shall not be sent to this court on appeal, but shall remain in the custody of the trial court below until the appeal is terminated.... A photograph of such exhibits may be included in the transcript.

App. R. 7.2(A)(3)(b). The pictures at issue here were a part of a six-photo array, placed on poster board for presentation to the jury. (R. at 1001.) It is unclear whether the pictures could be removed from the board and individually placed in the record for our review. Regardless, "[i]ncompleteness or inadequacy of the record shall not ... preclude review on the merits." App. R. 7.2(C)(2). While we could order the photos to be transmitted for our inspection, *id.*, we think the forensic pathologist's description of them provides sufficient information for the purposes of our analysis.

■ John Heidingsfelder, the forensic pathologist who performed the autopsy on Dallas Wallace, testified at trial that he took the two challenged photographs to illustrate the track of the bullet. He said that the first picture shows a dowel rod

passing through Wallace's head, traveling along the path left by the bullet that caused Wallace's death. The second picture was taken after Heidingsfelder stripped skin from the surface of Wallace's skull to show the exact point of bullet entry and impaction.

While the probative value and the prejudicial effect of these photographs seem in equipoise, evidence should be excluded only when its prejudicial effect *substantially* outweighs its probative value. *Malone,* 700 N.E.2d at 783; Ind. Trial Rule 403. We are not persuaded the trial judge committed an abuse of discretion in admitting them.

### Conclusion

We therefore affirm.

SULLIVAN, and RUCKER, JJ., concur.

DICKSON, J., concurs in result.

BOEHM, J., *concurs in result with separate opinion in which* DICKSON, J., concurs

BOEHM, Justice, concurring in result.

I believe the trial court should, at a minimum, have sustained objections to the prosecutor's claims to be a "minister of justice" and admonished the jury to disregard these statements. The clear implication of such a claim is, among other things, to vouch for the credibility for prosecution witnesses as prescreened by a neutral observer. In a perfect world that may be the case. Indeed, it may have occurred here. But to permit the prosecution to claim neutrality is both unnecessary and subject to abuse. In effect it presents a factual claim, sub silentio, that is untestable on the record, namely that the prosecutor is objective, thorough, and competent. That is hopefully always the case, and undoubtedly sometimes the case, but there is no need for the jury to be exposed to such a claim, and good reason to prohibit it.

Although I do not agree that the trial court's handling of the prosecutor's statements was correct, I also do not believe it affected the result, and therefore concur in the result reached by the majority.

DICKSON, J., concurs.