Dwayne BROWN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S00–0002–CR–93.

Supreme Court of Indiana.

April 17, 2001.

Katherine A. Cornelius, Indianapolis, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Appellant Dwayne Brown killed Morris Moore to prevent him from testifying against Brown's sister, who was about to be tried for murder. Brown says it was error to admit evidence during his trial about his sister's murder charge and subsequent guilty plea. He also claims that certain comments by the prosecutor and judge during closing arguments denied him a fair trial. We affirm.

**Facts and Procedural History**

On August 14, 1998, Daniel Riddell was driving around an eastside Indianapolis apartment complex in a borrowed car, looking for his own stolen car. He passed Morris Moore, who momentarily obstructed the street while backing a car into a parking space. After Riddell went by and was turning around, he heard several explosive sounds. When he again drove past Moore's car ten to twenty seconds later, he saw Brown standing over the car, reaching into the open driver's window with his right arm as if to grab the gearshift.

The car, now appearing unoccupied, started to roll. Riddell had an unobstructed view of Brown's face from a distance of

thirty feet or less. The two "locked eyes," then Brown fled. (R. at 213, 216–17.)

Another witness heard gunshots, came outside, and saw the car rolling to a stop. She found the wounded Moore sprawled across the front seat, and tried unsuccessfully to revive him. Moore died of multiple gunshot wounds.

The day after the murder, Riddell viewed a six-person photo array but did not recognize anyone as the man outside the car. Two days later, he viewed another array and positively identified Brown. He reconfirmed the identification at trial.

Brown knew at the time of the shooting that Moore had implicated Brown's sister,[1] Henri Tunstall, in a murder. (R. at 487, 489, 491.)

Brown pled an alibi, but his witnesses contradicted each other. The shooting occurred shortly before 3 p.m., across town from where Brown lived with his girlfriend. Brown's neighbor said that Brown was at the neighbor's house from about 3:15 that afternoon until about 6:30 that evening. (R. at 745, 754.) Brown's girlfriend said that neither she nor Brown left their house between 3:15 and 6:30. (R. at 802, 817, 819, 822.) The girlfriend's mother testified that she and her daughter went out shopping at 4:15 that afternoon. (R. at 882–83, 889–90.)

A jury found Brown guilty of murder and of carrying a handgun without a license.[2] The court sentenced Brown to sixty-five years on the murder count only.

## I. Evidence About Henri Tunstall's Case

The State sought to establish that Brown killed Moore to prevent him from testifying at Tunstall's murder trial. To do so, the prosecutor called to the stand the police officer who took Brown's voluntary statement on August 18, 1998, and played an audiotape of that statement.

In the statement, Brown admitted that in early August 1998 he saw a probable cause affidavit naming Morris Moore as an eyewitness to Tunstall's July 14th shooting of John Schaefer. Brown claimed that he did not recognize the witness' name when he saw it on the affidavit because he knew Moore then only as "Marquise."[3] Brown also stated that he was present when Schaefer was shot and that "Marquise," not Tunstall, was the shooter. During cross-examination, the defense sought to establish that it is not unusual to know someone by a nickname. To make this point, defense counsel elicited testimony from the police officer that Moore also went by the nickname "Q."

The gist of this defense was: "There was no reason for me to kill this man because I knew him as 'Marquise' or 'Q' and believed the witness against my sister was someone named Moore."

The prosecutor responded by calling Tunstall's attorney, who confirmed that on July 30, 1998, he gave Brown and other family members copies of Tunstall's charging information and probable cause affidavit. The prosecutor offered both into evidence. The information listed Moore as a

---

**1.** Although other testimony indicated that Tunstall was Brown's half-sister, (R. at 547), Brown referred to her in his statement to the police as his sister, (R. at 491).

**2.** Brown waived a jury trial on enhancement of the handgun offense from class A misde-

meanor to class C felony status based on a prior offense, and the court found him guilty.

**3.** On the other hand, there was evidence that Brown knew Moore reasonably well, having shared an apartment with him for three months the previous summer. (R. at 496–97.)

State's witness and the affidavit said that Moore was also known as "Q."

The defense then obtained Tunstall's attorney's testimony that Brown had been a potential witness on his sister's behalf. Brown's arrest, however, made him effectively unavailable in Tunstall's case. This seemed to imply that the police really arrested Brown to prevent him from testifying for his sister, rather than because they thought he killed Moore.

The prosecutor countered this implication by establishing that after Brown's arrest, Tunstall admitted that she shot Schaefer and pled guilty to involuntary manslaughter. Tunstall's attorney said that Brown's unavailability was not a major factor in Tunstall's decision to plead.

Defense counsel then sought to show that Tunstall's plea did not necessarily prove that she, not Morris, shot Schaefer. He was thwarted when Tunstall's attorney asserted attorney-client privilege and said he would advise Tunstall not to testify. At the defense's request, the court admonished the jury not to consider Tunstall's guilty plea as substantive evidence in Brown's trial.

■ *A. The Motive Evidence.* Brown first argues that evidence of the murder charge against Tunstall should have been excluded as unfairly prejudicial. (Appellant's Br. at 9–14.) Relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403. A trial court has wide discretion to admit evidence that tends to prove the defendant's motive. *Harris v. State*, 644 N.E.2d 552 (Ind.1994) (evidence that murder defendant had expressed his desire to learn how it felt to kill was properly admitted) (citing *Cornelius v. State*, 425 N.E.2d 616 (Ind.1981)).

■ Here, the motive evidence was highly probative of Brown's interest in permanently silencing Moore. The court acted within its discretion in allowing evidence that Brown knew that his victim was a key State's witness to a murder committed by Brown's sister.

■ *B. The Probable Cause Affidavit and Charging Information.* Brown next argues that the charging information and probable cause affidavit in his sister's case contained irrelevant, gruesome specifics and should have been excluded to avoid guilt by association. (Appellant's Br. at 14–15.) We agree that certain information in those documents (such as a reference to Tunstall's criminal record and the specifics of how the shooting occurred) went beyond the details necessary to establish motive. With hindsight, the more prudent course would have been to redact the extraneous information, or allow the parties to stipulate to the relevant facts.

■ Errors of this sort do not warrant reversal, however, unless the defendant can show prejudice. *Guajardo v. State*, 496 N.E.2d 1300 (Ind.1986). In *Guajardo*, the State introduced a probable cause affidavit and search warrant into evidence because the defendant challenged the warrant's adequacy. *Id.* Although the documents were relevant only to matters determinable by the court, they were shown to the jury. *Id.* We recognized that such documents often contain highly prejudicial statements, but looked to strong identification testimony in concluding that the error was harmless. *Id.*

■ Although the documents at issue here related to a different crime and a different defendant, the risk that irrelevant information will prejudice the defendant is similar. We therefore apply a similar harmless error analysis.

■ Brown's claim of prejudice consists entirely of speculation that he was a victim of guilt by association with his sister. The State, on the other hand, presented a strong case. The evidence showed that Brown had reason to want Moore dead. An impartial witness unequivocally identified Brown and described Brown's presence and activity at the murder scene. Brown's alibi witnesses told conflicting stories. We therefore conclude, as in *Guajardo*, that any error arising from the jury's exposure to irrelevant information on Tunstall's charging information and probable cause affidavit was harmless.

■ *C. Tunstall's Guilty Plea.* Brown argues that the defense did not open the door to testimony by Tunstall's attorney that Tunstall pled guilty to involuntary manslaughter. (Appellant's Br. at 16–19.) A review of the events at trial shows otherwise. A prosecutor may respond to inferences raised by the defense, even if that response would otherwise be objectionable. *Harris*, 644 N.E.2d at 554 (citing *Lopez v. State*, 527 N.E.2d 1119, 1126 (1988)). The defense suggested that Brown was actually arrested so that he could not serve as a witness for his sister. The prosecutor was entitled to counter as he did, by showing that Tunstall herself admitted killing Schaefer, and that Brown's arrest was not a significant factor in Tunstall's decision to plead guilty.

*D. Rebutting Tunstall's Guilty Plea.* Regardless of whether his attorney opened the door on this issue, Brown complains that he was unfairly denied the opportunity to quiz Tunstall's lawyer about whether she was innocent even though she pled guilty. (Appellant's Br. at 20–22.) He argues that his attorney was improperly prevented from asking questions in the jury's presence that were reasonably likely to prompt a claim of attorney-client privilege. (*Id.*)

He is incorrect. Indiana Evidence Rule 501(d)(2) plainly says: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury."

Tunstall had not yet been sentenced when her attorney took the stand in Brown's case, and Brown does not dispute that her attorney properly invoked privilege. (R. at 676–77, Appellant's Br. at 20.) The court followed the rules of evidence when it ordered defense counsel not to ask questions likely to produce a legitimate claim of privilege in the jury's presence. (R. at 692.)

Brown claims that this ruling caused the jury to be misled and prejudiced by partial information. (Appellant's Reply Br. at 2.) This assumes the jury would have been better informed by hearing questions go unanswered. Brown cries foul because he could not imply, without proving, that his sister perjured herself when she admitted in open court that she shot Schaefer. His claim is baseless.

## II. Closing Arguments

Brown argues that certain statements by the prosecutor during closing argument, and one comment by the trial judge, denied him a fair trial. (Appellant's Br. at 32.)

■ Defense counsel implied in closing that law enforcement officials ignored or actively concealed potentially exculpatory information, stating:

We have a bunch of people out there on that day and all we can hear from is Mr. Riddell and [the witness who attempted to revive Moore]. Where are all these other people? I mean, they're the ones who gave me these crossed out reports,

where are they.[4] How come they treat my witnesses, law enforcement treats my witnesses different than their witnesses?

(R. at 932.) The prosecutor argued in rebuttal:

It's the job of the prosecutor to tell you what the elements of the crime are. Direct evidence, the evidence that came from here, sworn testimony. You all took an oath that you would base your decision on sworn testimony saw here, and not statements and people that didn't come here, and not the unsworn testimony of defense counsel trying to throw other things in here. Our job is similar to being on the road, folks. We simply ask you to listen to the evidence, hear the elements and evaluate it. Here's the road, here are the elements of the crime, does the evidence match that. The role of the defense counsel is to get you off that road however they can. If they can ...

(R. at 939–40.) Defense counsel interrupted with an objection, which the trial judge overruled by saying "His argument is exactly appropriate." (R. at 940.) The prosecutor continued:

Do not be confused or feel sorry, or in any way ignore this evidence because the defense suggests to you, oh, we weren't treated fairly. I am absolutely incensed that [defense counsel] suggests to you that evidence was withheld from him and hidden from him. In October of 1998, [defense counsel] had all the addresses for these people. He had an opportunity to interview any witness that he wanted to.... This defense counsel suggests to you, not under oath, not taking the stand, that this is what you should know. And yet you know

from the evidence that he took statements from Daniel Riddell in October of 1998. He took statements from Detective Martinez in 1998. He wants you to think that there is something unfair about initially blocking out addresses. Why do we block out addresses? Because we don't [want] witness information being given out because we don't want people like this going out and killing our witnesses.

(R. at 941–42.) Defense counsel objected, and moved for a mistrial. The court overruled the objection and denied the motion.

The prosecutor resumed, with defense counsel continuing to interject objections. The court finally ordered defense counsel to sit down, so the prosecutor concluded without further interruption. Brown's final challenge is to the following statement:

What does that tell you about defense counsel's role here? He is doing his job. He is an experienced person, but he knows what he is doing, folks, and he is trying to get you off the elements of the crime.

(R. at 948.)

*A. Prosecutorial Misconduct.* Brown argues that "[t]hese attacks on defense counsel denied [him] a fair deliberation and verdict." (Appellant's Br. at 33.) He says the comments quoted above mischaracterized the roles of the prosecutor and defense. (Appellant's Br. at 34.)

 We begin evaluating claims of prosecutorial misconduct by asking whether misconduct in fact occurred. *Maldonado v. State*, 265 Ind. 492, 498, 355 N.E.2d 843, 848 (1976). If so, we consider whether the misconduct placed the defendant in a position of grave peril. *Id.* We assess

---

**4.** This referred to the fact that the State redacted addresses and telephone numbers when it originally provided a witness list, in accordance with local court rules. (R. at 941–42.)

grave peril based on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety. 265 Ind. at 499, 355 N.E.2d at 848. An isolated instance that does not rise to the level of grave peril by itself may become grave peril if repetition evidences a deliberate attempt to improperly prejudice the defendant. *Id.*

 All attorneys are officers of the legal system and have a duty of candor toward tribunals. *Coy v. State,* 720 N.E.2d 370, 373 (Ind.1999); Ind. Professional Conduct Rule 3.3 and Preamble. We hold prosecutors to an even higher standard of conduct. The Comment to Indiana Professional Conduct Rule 3.8 says: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Defense counsel frequently embrace this differential in duty.[5] As a leading criminal defense lawyer has asserted, "[D]efense counsel has a different agenda that is inherent in the adversary system itself." Albert J. Krieger, *Friendly Fire and Casualties of the War On Crime,* 30 Loy. L.A. L. Rev. 49, 53 (1996).

 Still, despite this actual difference in the ethical obligations of opposing counsel, we have concluded that permitting the combatants to play on these differences in front of a jury may jeopardize fairness in criminal trials. In *Miller v. State,* 623 N.E.2d 403, 408 (Ind.1993), we therefore disapproved of the prosecutorial tactic of reading from Justice White's concurrence

and dissent in *United States v. Wade,* 388 U.S. 218, 256–58, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) ("Law enforcement officers . . . must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts"; defense counsel's role may require conduct that "in many instances has little, if any, relation to the search for truth.").

In *Coy,* we emphasized the need for limits on the extent to which prosecutors may portray themselves as seekers of truth while denigrating the role of defense attorneys. 720 N.E.2d at 373. We also acknowledged the key role of the judicial officer on the scene, saying: "Which [statements] represent fair or harmless techniques and which are abusive is a call best placed in the hands of trial judges." *Id.*

 Here, the prosecutor was certainly entitled to respond to defense counsel's accusation in closing argument that the State had overlooked or even covered up evidence that could vindicate Brown. It is not so apparent that the prosecutor's remarks crossed the line into misconduct that we can say the trial judge abused her discretion.[6]

*B. The Judge's Ruling.* Brown argues that the judge violated her duty of impartiality when she overruled a defense objection by saying: "His argument is exactly appropriate."

 Judges require broad latitude to run their courtrooms and to maintain

---

5. Here, defense counsel acknowledged this difference even prior to closing arguments, by asking Tunstall's attorney: "And that is the role of the defense attorney, is to make the best argument they can. Correct?" (R. at 710.) The answer: "Defense attorney is to represent his client as zealously and as professionally as he's capable," to which Brown's lawyer responded, "Right." (*Id.*)

6. In any event, the evidence against Brown (summarized above) was so formidable that the remarks did not place him in grave peril. *See Scherer v. State,* 563 N.E.2d 584, 586–87 (Ind.1990) (no grave peril created by prosecutor's closing argument statements "someone is trying to snow you" and "you are snowed under and you have to try to dig yourself out" where evidence was overwhelming).

discipline and control. *Timberlake v. State*, 690 N.E.2d 243, 256 (Ind.1997) (citing *Dixon v. State*, 154 Ind.App. 603, 290 N.E.2d 731 (1972)). A defendant asserting judicial bias must show that the trial judge's actions and demeanor showed partiality and prejudiced his case. *Timberlake*, 690 N.E.2d at 256 (citing *McCord v. State*, 622 N.E.2d 504, 511 (Ind.1993)).

Brown complains about the style of a single ruling, in effect arguing that the trial judge was too emphatic. Had she said instead, "I think it's an appropriate comment, so I'll overrule the objection," there would be little doubt about her impartiality. As it is, her choice of words did not display the sort of partiality that would warrant a reversal.

### Conclusion

We affirm the judgment of the trial court.

DICKSON, SULLIVAN, and RUCKER, JJ., concur.

BOEHM, J., concurs in result.