**Jonathan C. RICHARDSON,**
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 82A04–0211–CR–536.**

Court of Appeals of Indiana.

Aug. 28, 2003.

Matthew Jon McGovern, Louisville, KY, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Zachary J. Stock, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Jonathan C. Richardson appeals his conviction for Murder following a jury trial. He presents the following issues for our review:

1. Whether the prosecutor committed misconduct during voir dire.

2. Whether the trial court abused its discretion when it denied his motion to suppress evidence.

3. Whether the State presented sufficient evidence to establish the corpus delicti of murder.

We affirm.

### FACTS AND PROCEDURAL HISTORY

Richardson married Linda Mason in September 2001. Mason had a daughter, F.L., from a previous relationship. On the morning of September 12, 2001, Mason went to work and left eleven-month-old F.L. in Richardson's care. At approximately 4:30 or 5:00 that afternoon, friends of Richardson, Andrew Buttrum and his

fiancée, stopped by to visit. Instead of inviting his guests inside, as he usually did when they visited, Richardson told them that F.L. was sleeping, so the three of them sat down outside. Buttrum thought that Richardson was acting strangely and noted that loud music was playing inside the house despite Richardson's claim that F.L. was asleep. Buttrum and his fiancée also observed that Richardson had a fresh, bleeding tattoo of F.L.'s name on his arm. Buttrum and his fiancée left after approximately twenty minutes.

At approximately 6:45 p.m. that evening, Richardson went to a neighbor's apartment and called 911 to report that F.L. was unconscious. Emergency personnel arrived and transported F.L. to the hospital. When Evansville Police Officer Jeffery Hales arrived at the scene, he approached Richardson, who was standing outside. Officer Hales asked Richardson what had happened to the child, and Richardson explained that he had put F.L. down for a nap and when he checked on her sometime later, he observed vomit coming out of her mouth and called for help. F.L. was resuscitated, but died at the hospital.

Richardson gave two statements to police, one on September 12, and a second one on September 19. In his first statement, Richardson described the events to Detective Clinton Coomer as follows:

> He said that ... [F.L.] had been fussy earlier in the day, that he had put her down ... in the playpen, left her there for an hour, hour and a half, then he got her out, rocked her to sleep and put her in the crib.

> \*      \*      \*

[Then] he started cleaning the house ... [and] about fifty minutes later or so he went and checked on her, found that she was not breathing, had a blank stare on her face, mucus coming from her nose and mouth.

> \*      \*      \*

[Then he] [t]ook [F.L.] out of the crib, placed her on the master bed laying [sic] on her side then he went to a back neighbor to get help, have them call 911 [1] also to see if any of them could perform CPR.

> \*      \*      \*

[He said that] [n]o one tried to perform CPR until medical personnel arrived.

Detective Coomer observed that Richardson was calm and "unemotional" during the September 12 interview.

On September 19, Detective Coomer asked Richardson to accompany him to the police station for an interview, and Richardson agreed. After being advised of his *Miranda* rights, Richardson explained as follows: [2]

> [F.L. was] fussier than usual, [so] he played with her, played video games with her in the playpen and she was still fussy and he was trying to get her to calm down and at one point he stated that he threw her up into the air about twelve to eighteen inches, whenever she came down and he caught her, that her head bopped forward and back up in a rough type of a manner. He said this normally works whenever he would see his wife do it but this time it didn't. She continued to cry and fuss and tried something else at that point.

> \*      \*      \*

**1.** The evidence shows that Richardson had a working telephone in his apartment at the time.

**2.** We note that the record on appeal does not include any written statements made by Richardson.

He said that since throwing her up in the air didn't work that he tried to shake her in a manner that he would thrust her out and then pull her back in a rough manner or at least what he physically showed us because he got up out of the chair and physically showed us how he thrust her out and pulled her back in.

An autopsy subsequently showed that F.L. died of asphyxiation by manual strangulation.

The State charged Richardson with murder, and he was incarcerated awaiting trial. While incarcerated, Richardson was placed in a "suicide cell" along with several other inmates. On December 21, 2001, a disturbance erupted in the suicide cell, and officers suspected that Richardson had a role in instigating that disturbance. Lieutenant James Spence, a corrections officer, escorted Richardson out of the cell to talk to him in an attempt to determine the source of the cellmates' discontent. Richardson explained that he and the others were upset because of a lack of privileges for inmates under suicide watch. Lieutenant Spence then asked Richardson what he was being incarcerated for, and Richardson responded "Murder." At that point, another officer checked Richardson's booking sheet and advised Lieutenant Spence that Richardson was incarcerated for reckless homicide. When Lieutenant Spence relayed that information to Richardson, he stated "well all I know is I killed the little f***ing bitch."

At Richardson's trial, during voir dire, the prosecutor engaged a potential juror in a colloquy regarding the different roles that prosecutors and defense attorneys have. Richardson objected to the following question posed by the prosecutor: "So [a defense attorney's] job is to do whatever it takes to get you to believe he didn't do it?" The trial court asked the prosecutor to rephrase the question, which he did, and

Richardson did not object to the question as it was rephrased. At the close of voir dire, Richardson requested an admonishment to the jury regarding the role of defense counsel, but the trial court denied that request.

During the State's case-in-chief, Richardson moved to suppress the inculpatory statement he made to Lieutenant Spence while incarcerated. The trial court denied that motion. The jury ultimately found Richardson guilty as charged, and the trial court sentenced him accordingly. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Prosecutorial Misconduct

■ Richardson first contends that the prosecutor committed misconduct during voir dire. Specifically, Richardson challenges the prosecutor's remarks during the following colloquy with a potential juror:

STATE: ... I took [defense counsel] as implying that Detective Coomer may be up for a promotion based on the amount of convictions that he happens to get, do you believe that?

JUROR: No, not really.

STATE: Do you believe his job is to investigate allegations of crimes and to bring the information that he learns in his particular investigation into the Court of Law and let a Judge or Jury decide guilt or innocence?

JUROR: Yes, that would be his job.

STATE: Would you agree that the job of the Prosecutors, that we have ethical duties to present these cases to Jurors understanding what our oaths are as Attorneys and Prosecutors and understanding our role of presenting the case beyond a reasonable doubt?

JUROR: Yes.

STATE: Do you see that the role[ ] of the Defense Attorney is different than what our roles are?

JUROR: Yes, very different.

STATE: Would you agree that through cross examination their role is to try to poke holes into our case?

JUROR: Yes, they are probably trying to prove that their Defendant is not guilty by using witnesses or having something, (inaudible) through cross examination of witnesses.

STATE: So their job is to do whatever it takes to . . .

JUROR: Defend.

STATE: . . . get you to believe he didn't do it?

Richardson then objected, stating, "Object to that, your Honor. I think the connotation do whatever it takes is not within our Indiana Law." The trial court then asked the prosecutor to rephrase the question, and the prosecutor complied. Richardson did not object to the question as rephrased. At the close of voir dire, during a side bar, Richardson asked the trial court to "advise the Jury that all Attorneys serve under the same rules." But the court declined that request.

Our supreme court has addressed claims of prosecutorial misconduct under similar facts. Particularly, in *Brown v. State*, 746 N.E.2d 63, 69–70 (Ind.2001), the court addressed the issue as follows:

We begin evaluating claims of prosecutorial misconduct by asking whether misconduct in fact occurred. If so, we consider whether the misconduct placed the defendant in a position of grave peril. We assess grave peril based on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety. An isolated instance that does not rise to the level of grave peril by itself may become grave peril if repetition evidences a deliberate attempt to improperly prejudice the defendant.

All attorneys are officers of the legal system and have a duty of candor toward tribunals. Ind. Professional Conduct Rule 3.3 and Preamble. We hold prosecutors to an even higher standard of conduct. The Comment to Indiana Professional Conduct Rule 3.8 says: "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Defense counsel frequently embrace this differential in duty. As a leading criminal defense attorney has asserted, "[D]efense counsel has a different agenda that is inherent in the adversary system itself." Albert J. Krieger, *Friendly Fire and Casualties of the War on Crime*, 30 Loy. L.A. L.Rev. 49, 53 (1996).

Still, despite this actual difference in the ethical obligations of opposing counsel, we have concluded that permitting the combatants to play on these differences in front of a jury may jeopardize fairness in criminal trials. In *Miller v. State*, 623 N.E.2d 403, 408 (Ind.1993), we therefore disapproved of the prosecutorial tactic of reading from Justice White's concurrence and dissent in *United States v. Wade*, 388 U.S. 218, 256–58 [87 S.Ct. 1926, 18 L.Ed.2d 1149] . . . (1967) ("Law enforcement officers . . . must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts"; defense counsel's role may require conduct that "in many instances has little, if any, relation to the search for truth.").

In [*Coy v. State*, 720 N.E.2d 370 (Ind. 1999) ], we emphasized the need for limits on. the extent to which prosecutors may portray themselves as seekers of truth while denigrating the role of defense attorneys. We also acknowledged the key role of the judicial officer on the

scene, saying: "Which [statements] represent fair or harmless techniques and which are abusive is a call best placed in the hands of trial judges."

(Citations omitted, footnote omitted).

In *Brown,* after defense counsel implied in closing argument that law enforcement officials ignored or actively concealed potentially exculpatory information, the prosecutor responded in closing as follows:

> It's the job of the prosecutor to tell you what the elements of the crime are.... Our job is similar to being on the road, folks. We simply ask you to listen to the evidence, hear the elements and evaluate it. Here's the road, here are the elements of the crime, does the evidence match that. The role of the defense counsel is to get you off that road however they can. If they can ... [Defense counsel objected, trial court overruled.]
>
> Do not be confused or feel sorry, or in any way ignore this evidence because the defense suggests to you, oh, we weren't treated fairly. I am absolutely incensed that [defense counsel] suggests to you that evidence was withheld from him and hidden from him.... [Defense counsel continued to interject objections and moved for mistrial, but trial court allowed prosecutor to continue.]
>
> What does that tell you about defense counsel's role here? He is doing his job. He is an experienced person, but he knows what he is doing, folks, and he is trying to get you off the elements of the crime.

*Id.* at 69. Our supreme court held that "the prosecutor was certainly entitled to respond to defense counsel's accusation in closing argument that the State had overlooked or even covered up evidence that could vindicate Brown. It is not so apparent that the prosecutor's remarks crossed the line into misconduct that we can say

the trial judge abused her discretion." *Id.* at 70.

In this case, prior to the alleged prosecutorial misconduct, Richardson's counsel engaged in a colloquy with a potential juror regarding the "stakes" both his client and the State, as well as the detective who worked on the case, have in the outcome of the trial. In addition, Richardson's counsel discussed the role of a defense attorney with three potential jurors, who stated, respectively, that a defense attorney's job is to "prove their [sic] client is innocent," to "protect your client and ... give reason[able] doubt," and to *"do everything they can to prove that their client is not guilty."* (Emphasis added). In response to those statements, Richardson's counsel reiterated that the burden of proof regarding each element of the offense rests with the State, and he stated that a defense attorney can "prove [his client's] case ... through cross examination of witnesses of the State[.]"

While those statements cannot be characterized as accusatory, like those defense counsel made in *Brown,* they provide context for the prosecutor's statements. Indeed, the only statement to which Richardson objected during the colloquy set out above, namely, that a defense attorney's "job is to do whatever it takes to get you to believe he didn't do it[ ]," is almost identical to one of the potential juror's comments to defense counsel (stating that a defense attorney's role is to "do everything they [sic] can to prove that their [sic] client is not guilty."). And the prosecutor's question, "Would you agree that through cross examination [defense counsel's] role is to try to poke holes into our case[ ]," is similar to Richardson's counsel's statement regarding the use of cross examination to prove a defendant's case.

We agree with our supreme court that, under circumstances such as those present

here, a determination whether the prosecutor committed misconduct "is a call best placed in the hands of trial judges." *Coy v. State,* 720 N.E.2d 370, 373 (Ind.1999). It is not so apparent that the challenged colloquy between the prosecutor and potential jurors "crossed the line into misconduct" that we can say the trial court abused its discretion here. *See Brown,* 746 N.E.2d at 70.

## Issue Two: Motion to Suppress

Richardson next contends that the trial court abused its discretion when it denied his motion to suppress the inculpatory statement he made to Lieutenant Spence while incarcerated. Specifically, Richardson maintains that his statement was not admissible in court because he was not read his *Miranda* rights before he made the statement. We review the denial of a motion to suppress in a manner similar to other sufficiency matters. *Overstreet v. State,* 724 N.E.2d 661, 663 (Ind.Ct. App.2000), *trans. denied.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* However, unlike the typical sufficiency of the evidence case where only the evidence favorable to the judgment is considered, we must also consider the uncontested evidence favorable to the defendant. *Id.*

Rights under *Miranda* apply only to custodial interrogation. *White v. State,* 772 N.E.2d 408, 412 (Ind.2002). Here, because Richardson was incarcerated at the time he made the statement at issue, the first element of a *Miranda* violation is fulfilled. Next, under *Miranda,* "interrogation" includes express questioning and words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response

from the suspect. *Id.* Volunteered statements do not amount to interrogation. *Id.*

At the time Richardson made the statement at issue, Lieutenant Spence was questioning him about the disturbance in the suicide cell. Lieutenant Spence asked Richardson "what [he was] in jail for," and Richardson replied, "Murder." When another corrections officer told Lieutenant Spence that the booking sheet indicated Richardson had been charged with reckless homicide, Lieutenant Spence informed Richardson of that fact. Richardson then stated, not in response to a question posed to him, that "all [he] knew is [he] killed the little f***ing bitch[.]" We conclude that neither Lieutenant Spence's initial question regarding why Richardson was in jail, nor any of Lieutenant Spence's other words or actions were "reasonably likely to elicit an incriminating response" from Richardson. *See White,* 772 N.E.2d at 412. Moreover, Richardson's statement, made after Lieutenant Spence gave him information that conflicted with Richardson's understanding of what he was charged with, was voluntary. Thus, the statement at issue was not obtained through interrogation and was admissible. *See White,* 772 N.E.2d at 412.

## Issue Three: Corpus Delicti

Finally, Richardson contends that the State failed to establish the corpus delicti.[3] The corpus delicti requirement seeks to prevent the admission into evidence of a confession by a defendant to a crime that never occurred. *Johnson v. State,* 785 N.E.2d 1134, 1140 (Ind.Ct.App. 2003), *trans. denied.* As our supreme court has explained,

In Indiana, a crime may not be proven based solely on a confession, and admis-

---

**3.** The literal translation of corpus delicti is "body of the crime." *See* BLACK'S LAW DICTIO-

NARY 346 (7th ed. 1999).

sion of a confession requires some independent evidence of the crime including evidence of the specific kind of injury and evidence that the injury was caused by criminal conduct. However, *this evidence need not prove that a crime was committed beyond a reasonable doubt, but merely "provide an inference that a crime was committed."*

*Id.* (quoting *Workman v. State,* 716 N.E.2d 445, 447–48 (Ind.1999) (citation omitted)) (emphasis added). The inference of a crime may be established by circumstantial evidence. *Id.*

Richardson maintains that the only independent evidence to support an inference that F.L. was murdered was the testimony of Dr. John Heidingsfelder, who testified that F.L. died of asphyxiation as the result of compression to her neck. But Richardson asserts that Dr. Heidingsfelder's testimony, "absent any corroborating evidence[,] fails to provide any substantive evidence upon which a trier of fact could find that [F.L.] was murdered." We cannot agree.

In support of that contention, Richardson relies on the following rule stated by our supreme court in *Strong v. State,* 538 N.E.2d 924, 930 (Ind.1989): "[e]xpert opinion regarding causation may be admissible and yet in conjunction with other evidence may be sufficient or insufficient to sustain a verdict." But, contrary to Richardson's assertion, nothing in *Strong* requires that an expert's opinion be supported by *corroborating evidence.* Instead, the issue in *Strong* is whether there is a " 'threshold level of certainty or conclusiveness ... required in an expert's opinion as a prerequisite to its admissibility.' " *Id.* at 931 (quoting *Noblesville Casting Div. of TRW v. Prince,* 438 N.E.2d 722, 731 (Ind.1982)). The court held that there is no threshold level of certainty, and it restated the well-settled rule that a jury is always " 'free

either to accept or reject the opinion of the expert witness....' " *Id.*

Regardless, as the court stated in *Workman,* 716 N.E.2d at 447–48, evidence of corpus delicti need not prove that a crime was committed beyond a reasonable doubt, but merely "provide an inference that a crime was committed." The holding in *Strong,* as stated above, applies to a challenge to the sufficiency of the evidence *to sustain a verdict,* not the sufficiency of the evidence to support an *inference* that a crime occurred. As such, Richardson's argument on this issue misses the mark.

Dr. Heidingsfelder testified that F.L. died of asphyxiation as a result of manual strangulation. That evidence is sufficient to provide an inference, at the very least, that F.L. was murdered. *See, e.g., Johnson v. State,* 653 N.E.2d 478, 480 (Ind. 1995) (holding evidence sufficient to establish corpus delicti even though not sufficient to "conclusively establish" each element of charged offense); *see also Light v. State,* 547 N.E.2d 1073, 1080 (Ind.1989) (rejecting defendant's contention that corpus delicti not established where expert witness did not specifically state opinion based on reasonable medical certainty). Richardson points to evidence contradicting Dr. Heidingsfelder's opinion establishing the corpus delicti, but that is an invitation to reweigh the evidence, a task not within our prerogative on appeal. We hold that the State established the corpus delicti in this case.

Affirmed.

BROOK, C.J., and BAILEY, J., concur.