## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Feb 12 2015, 10:22 am

**CLERK**
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

John Jacob Warrum
Mount Vernon, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

Derrick Demarco Armstead,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 12, 2015

Court of Appeals Cause No.
65A01-1408-CR-232

Appeal from the Posey Superior Court
The Honorable S. Brent Almon, Judge
Cause No. 65D01-1307-FA-337

**Bradford, Judge.**

# Case Summary

[1] On July 29, 2013, Appellant-Defendant Derrick Demarco Armstead engaged in an altercation outside a mobile-home community which resulted in two men being stabbed and beaten. Although Armstead admitted to stabbing one of the victims, he argues that he did so in self-defense after the victim poured gasoline on him. At trial, Appellee-Plaintiff the State of Indiana (the "State") introduced evidence of a cell phone video which captured a portion of the events. Armstead attempted to elicit testimony from a detective regarding what is shown on the video. The State objected to the detective's opinion testimony and the trial court sustained the objection. Soon thereafter, the State began asking the detective a question about whether Armstead requested that the detective test his clothes for accelerant. Armstead objected and the trial court sustained the objection. On appeal, Armstead argues (1) it was prosecutorial misconduct for the State to have asked the question regarding accelerant testing and (2) the trial court abused its discretion by not allowing him to question the detective about the contents of the video. We affirm.

# Facts and Procedural History

[2] On July 29, 2013, Armstead and Christopher Bradshaw began arguing outside at the mobile-home community in which Christopher lived. Property manager Tyfney Bennett intervened and attempted to settle the dispute between the two. After Armstead's girlfriend and Christopher's wife began to argue, Bennett told

Christopher's wife to call the police. Armstead then backed off, began walking away and said, "I will f***ing kill you all." Tr. p. 256.

[3] Soon thereafter, Larry Bradshaw, Christopher's father, arrived at the mobile home. Larry worked as a handyman for the property and was delivering materials to another trailer. When he arrived, Larry was unaware of the prior altercation between Christopher and Armstead. Upon exiting his truck, Larry noticed Armstead standing nearby and asked him if there was a problem. Armstead replied, "F*** yes there is, I am going to cut your f***ing throat." Tr. p. 290. Armstead then removed a folded knife from his pocket and approached Larry. Armstead's girlfriend also approached Larry carrying a baseball bat. The two attacked Larry, Armstead stabbing him multiple times in the chest, arm, and back, and Armstead's girlfriend striking Larry in the head with the baseball bat. Christopher ran to aid his father but was in turn stabbed by Armstead in the chest and neck. Armstead admitted to stabbing Larry but contends that it was in retaliation after Larry poured gasoline on him. Larry testified that he did not pour or attempt to pour gasoline on Armstead.

[4] At trial, the State introduced a short video recording taken by neighbor Lynn Owens. Owens testified that she saw Armstead, his girlfriend, and two other men approach and attack Larry. At no point did Owens see Larry pour gasoline on Armstead. Owens began recording the altercation with her cell phone after Christopher ran to help his father. Owens testified as to the events recorded in the video which showed Christopher rolling on the ground after being attacked followed by two men attempting to assist Christopher. Later in

the trial, defense counsel questioned Detective Jeremy Fortune about Owens's video:

> Q: Detective, you have had an opportunity to view that video multiple times, I believe that I was saying after [Armstead] knocks Chris down were you able to tell that somebody comes from right to left and gets back into, or gets into the fight?
> A. Yes.
> [The State objects]
> The State: He is asking him to give an opinion as to what is on the video, he was not a party to that video, he didn't make the video, he is not one of the witnesses on the video, what he is asking him to do is give an opinion which is in the purview of the Jury …

Tr. p. 441. Armstead responded that the detective's testimony was permissible under Rule 701 of the Indiana Rules of Evidence. The trial court sustained the State's objection but allowed Armstead to continue questioning Detective Fortune about other events depicted on the video.

> Q: Detective Fortune, the video that you reviewed, there is a gentleman walking up the road, looks like he has a blood stained shirt on, did you see that?
> A: Yes, excuse me, yes.
> Q: Gentleman with a gray shirt with blood on it, did you believe that to be Larry Bradshaw?
> The State: Again, Your Honor, these are the same questions that go to the objection that I made.
> The Court: Alright, maybe, but I am going to let him answer this one, you may answer.
> A: Yes.
> Q: I will show you what I have marked as Defendant's Exhibit "B" and you have already looked at this once –
> A: Yes.
> Q: – and that was the shirt you collected from the hospital and that was the shirt that Larry Bradshaw was wearing.
> A: Yes.

Q: Do you believe that is the same shirt you saw him in walking up the hill in the video?
A: Yes, yes.

Tr. pp. 442-443.

[5] Soon thereafter, defense counsel asked Detective Fortune whether the police had tested Armstead's clothes for the presence of accelerants. Detective Fortune stated that the police lab would not accept Armstead's clothing for accelerant testing because it was not an arson case. On redirect, Detective Fortune stated that he did not smell gasoline on Armstead's clothing, after which the following exchange occurred:

[6] The State: [addressing Detective Fortune] Did [defense counsel] ever provide you with a court order that would require you…

> Defense Counsel: Judge, I am going to object. I have absolutely no obligation to prove or disprove anything, that's the status of the law and that is the implication.
> The State: First of all, I haven't finished the question, second of all, the fact that he doesn't – he doesn't have a burden to do anything, but that doesn't mean he doesn't have the opportunity to ask this Court to order the State…
> The Court: This is when I am going to ask you to come to the bench to finish your question.

Tr. pp. 451-52. Following a bench conference outside the jury's presence, the State withdrew the question. At the conclusion of Detective Fortune's testimony, Armstead moved for a mistrial, arguing that the State's withdrawn question to detective Fortune hindered Armstead's ability to receive a fair trial

by suggesting to the jury that Armstead had a burden of proof. The trial court denied Armstead's motion.

On April 11, 2014, the jury convicted Armstead of Class A felony attempted murder, Class B felony aggravated battery, and two Class C felonies for battery by means of a deadly weapon. After a bench trial, the trial court found Armstead to be a habitual offender. At sentencing, the trial court vacated two of the battery convictions finding them to be lesser-included offenses of attempted murder. The trial court sentenced Armstead to thirty-eight years for attempted murder, enhanced thirty years for being a habitual offender, and six years for battery by means of a deadly weapon, to be served consecutively.

# Discussion and Decision

Armstead raises two issues on appeal: (1) whether it was prosecutorial misconduct for the State to ask Detective Fortune if defense counsel ever obtained a court order to have Armstead's clothes tested for accelerant, and (2) whether the trial court abused its discretion by declining to allow defense counsel to elicit testimony from Detective Fortune about the contents of Owens's video.

## I. Prosecutorial Misconduct

"In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a

position of grave peril to which he or she would not have been subjected' otherwise." *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied* (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). To preserve a claim of prosecutorial misconduct on appeal, a defendant must (1) raise a contemporaneous objection, (2) request an admonishment, and (3) if the admonishment is not given or is insufficient to cure the error, then he must request a mistrial. *Washington v. State*, 902 N.E.2d 280, 289-90 (Ind. Ct. App. 2009) (citing *Flowers v. State*, 738 N.E.2d 1051, 1058 (Ind. 2000)). "Failure to request an admonishment or to move for mistrial results in waiver." *Dumas v. State*, 803 N.E.2d 1113, 1117 (Ind. 2004) (citing *Brewer v. State*, 605 N.E.2d 181, 182 (Ind. 1993)).

[10] Armstead properly objected to the alleged misconduct at trial but failed to request an admonishment. As such, he has waived this issue for review.

> Our standard of review is different where a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, that is, waived for failure to preserve the claim of error. The defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) constitute clearly blatant violations of basic and elementary principles of due process and (b) present an undeniable and substantial potential for harm. The element of such harm is not established by the fact of ultimate conviction but rather depends upon whether the defendant's

right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled. In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible.

*Ryan*, 9 N.E.3d at 667-68. (quotations and citations omitted).

[11] We are unpersuaded by the logical leap Armstead makes in suggesting that the prosecutor's question – or half question – "operated to shift the burden of proof from the State to the defendant," and thus placed Armstead in "grave peril." Appellant's Br. p. 7. Asking whether Armstead ever requested that the State test his clothes for accelerant does not imply that he had an obligation to do so. Furthermore, even if the question had been asked in its entirety, it was an invited response to defense counsel's questions concerning the testing of the shirt for accelerants. "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004) (citing *Brown v. State*, 746 N.E.2d 63, 68 (Ind. 2001)).

[12] In any case, the State was not allowed to finish asking the allegedly inappropriate question, and ultimately withdrew the question. We are unconvinced that the jury anticipated the unasked portion of the question, and then proceeded to infer that the burden of proof had shifted to Armstead. This seems particularly unlikely considering that the jury was repeatedly informed

that the State carried the burden of proof, including a specific oral and written instruction that "[t]he State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense …. It is a strict and heavy burden." Tr. pp. 479-480. We find no merit in the argument that the prosecutor's alleged misconduct put Armstead in a position of grave peril, depriving him of a fair trial, much less that the trial court committed fundamental error in declining to find as much.

## II. Exclusion of Opinion Testimony

[13] Rule 701 of the Indiana Rules of Evidence provides: "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue." While the person giving opinion testimony under Rule 701 need not be qualified as an expert, he should possess knowledge beyond that of the ordinary juror. *Prewitt v. State*, 819 N.E.2d 393, 413 (Ind. Ct. App. 2004) *trans. denied*. Trial courts have broad discretion in determining whether lay opinion testimony satisfies the requirements of admissibility under Rule 701. *State v. Snyder*, 732 N.E.2d 1240, 1245 (Ind. Ct. App. 2000). "Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court." *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citations omitted). Finding that the trial court erred in the admission or exclusion of

evidence is not alone enough to warrant reversal. *Corbett v. State*, 764 N.E.2d 622, 628 (Ind. 2002). Such errors are to be disregarded as harmless unless they affect the substantial rights of the party. *Id.*

[14] Armstead attempts to draw comparisons to *Smith v. State*, 829 N.E.2d 64 (Ind. Ct. App. 2005). In *Smith*, another panel of this court affirmed the admission of a detective's lay opinion testimony about what Smith appeared to be doing in a videotape made at the police station while Smith waited alone in an interview room. *Id.* at 72. Specifically, the detective testified that Smith appeared to be pulling money from a body cavity. *Id.* In reaching this conclusion, we noted that the detective had been a member of the drug task force for three-and-a-half years, had received specific training at the United Drug Task Force beyond that provided to police officers, and had conducted numerous controlled buys. As such, the detective's training and experience gave her knowledge beyond that of the average juror with regard to the drug culture and helped the jury determine whether Smith had been in possession of money from a controlled drug sale with an informant.

[15] Armstead's reliance on *Smith* is misplaced. In this instance case, Detective Fortune had no specific knowledge or insight as to the events in the video beyond that of the average juror. Detective Fortune did not record the video nor was he present during the altercation. The jury heard testimony as to what was on the video from Owens, who recorded the video, in addition to several witness descriptions of the altercation. Detective Fortune had no additional information which could provide the jury with insight as to what was shown on

the video. Furthermore, simply because the trial court in *Smith* was within its discretion to allow a detective's description of a video does not mean that the trial court in the instant case was not within its broad discretion to disallow a video description.

[16] Even assuming the trial court erred, any such error was harmless and would not warrant reversal. In addition to the testimony of numerous witnesses which discounted Armstead's version of the events, Owens testified that Armstead attacked Larry without provocation and that she at no point saw Larry with a gas can. It is hard to imagine any potential evidence Detective Fortune could have provided about the video which would bolster Armstead's version of the events, much less lead the jury to a different conclusion.

[17] The judgment of the trial court is affirmed.

Najam, J., and Mathias, J, concur.