**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 15 2013, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARY SPEARS**
Kammen Maryan & Moudy
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LEE YODER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 17A03-1206-CR-294 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE DEKALB SUPERIOR COURT
The Honorable Kevin P. Wallace, Judge
Cause No. 17D01-1002-FB-10

**May 15, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**SHARPNACK, Senior Judge**

## STATEMENT OF THE CASE

Lee Yoder appeals his conviction for arson, a Class B felony. Ind. Code § 35-43-1-1 (2002). We affirm.

## ISSUES

Yoder raises four issues, which we restate as:

I. Whether the trial court erred by admitting evidence of Yoder's uncharged misconduct.

II. Whether the trial court committed fundamental error by admitting testimony from an investigator on the cause of the fire.

III. Whether the prosecutor engaged in misconduct amounting to fundamental error.

IV. Whether the evidence is sufficient to sustain the conviction.

## FACTS AND PROCEDURAL HISTORY

During the times relevant to this case, Yoder was a volunteer firefighter with the Spencerville Fire Department ("SFD"). After sunset on the evening of January 23, 2010, he called his chief, Phillip Shull, to report a fire. Yoder told Shull that he had smelled smoke while standing outside his home and thought it was coming from a cabin owned by Martha and Carlton Sauder ("the Sauder cabin"). The Sauder cabin was 2000 feet from Yoder's home. Shull asked Yoder if the windows of the cabin were black, and Yoder said he would check. After a thirty-second pause, Yoder confirmed that the windows were black. Shull told Yoder to call 911. It struck Shull as unusual that Yoder called him because he thought Yoder should have called 911 first.

2

Yoder called 911. He first asked, "is this DeKalb County's Dispatch?" Tr. Ex. Vol., State's Trial Ex. 6. Next, he gave the address of the cabin to the dispatcher and said he had smelled smoke from his house. Yoder also said he was with the SFD and provided his department number. He told the dispatcher his chief "[said] that it's a possible structure fire." *Id.* The dispatcher asked Yoder to stay on the line to provide more information, but Yoder hung up. Yoder called back a short while later to correct the address that he had provided and gave the dispatcher his name only after being asked.

Next, Shull left home and drove to the Sauder cabin. Upon arriving, he saw smoke coming out of one of the cabin's gables by the light of his headlights. It was light smoke, like "smoke comin' off of a campfire." Tr. p. 427. Shull did not smell smoke from where he parked and did not see any flames. The department's fire engine arrived at the same time, and Yoder was with the engine crew. Shull approached the cabin. He walked around the cabin and found that both doors were closed, but one was unlocked. None of the windows were open, and there were no electrical lines or gas or electrical meters affixed to the cabin. Yoder and another firefighter entered the cabin through the unlocked door and extinguished the fire.

The firefighters informed Shull that a chair had been on fire. Next, SFD's fire investigator, Dan Bushee, arrived at the cabin. He examined the cabin's interior and determined that the fire began in a chair or a nearby wastebasket. Bushee ruled out accidental or natural causes for the fire.

Nine days later, Bushee visited the scene of another fire the SFD had extinguished and determined it had been intentionally set. He requested assistance from Michael

3

Vogely, an investigator with the State Fire Marshal's Office. Vogely looked at the SFD's recent history and determined that they had dealt with "roughly around ten fires in a year and a half," which he considered an "abnormal amount." *Id.* at 401.

During a subsequent investigation, the police discovered that Yoder had reported six fires to 911 over the past year. Yoder later admitted under police questioning that he had set five fires (four of which he had reported to 911), but he denied setting any others, including the fire at the Sauder cabin.

The State charged Yoder with two counts of arson as Class B felonies and one count of arson as a Class D felony. The Class B felony charges arose from the Sauder cabin fire and a fire at property owned by Yoder's relative, Larry Yoder. The Class D felony charge arose from a shed on property owned by Richard and Kay Cook (discussed below as "the Cook fire").

Yoder initially pleaded guilty, but he withdrew his guilty plea at a sentencing hearing. Next, Yoder filed a motion in limine, which the trial court granted in part and denied in part. Specifically, the trial court determined that statements Yoder gave during a police interview on February 5, 2010, were inadmissible as evidence. As a result of that ruling, the State dismissed two of the arson charges, leaving only the charge related to the Sauder cabin. However, the trial court determined in the same ruling that evidence of Yoder's involvement in fires other than the Sauder cabin fire was admissible as "evidence of a plan, or modus operandi." Appellant's App. p. 126. Subsequently, Yoder filed another motion in limine asking the court to exclude from evidence all 911 calls he

4

had made to report fires other than the fire at the Sauder cabin. The court denied Yoder's motion.

At trial, the State presented evidence about the Sauder cabin fire, the five fires that Yoder had admitted setting, and three other fires that Yoder denied setting. Tr. Ex. Vol., State's Trial Ex. 4. A jury determined that Yoder was guilty of arson, and the trial court sentenced him accordingly. This appeal followed.

<u>DISCUSSION AND DECISION</u>

I. UNCHARGED MISCONDUCT

Yoder claims the trial court should not have admitted evidence of fires other than the Sauder cabin fire, arguing that those other fires were instances of uncharged misconduct that were unfairly prejudicial to him in violation of Indiana Evidence Rule 404(b). As a preliminary matter, we must determine whether Yoder preserved this issue for appellate review. Failure to object at trial waives an issue for review unless fundamental error occurred. *Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012).

At trial, Yoder objected under Rule 404(b) to testimony about other fires from two witnesses, Vogely and Detective John Zagelmeier.[1] The court overruled his objections. Yoder also stated a general objection to the admission of such evidence after both parties had rested, but that objection was too late. Consequently, we deem Yoder's challenge to the admission of evidence of other fires under Rule 404(b) to be properly preserved only as to Vogely and Zagelmeier's testimony and waived as to other witnesses' testimony.

[1] The transcript does not show that Yoder raised those objections. Instead, it shows that the parties approached the bench for conferences that were inaudible to the court reporter. However, while this appeal was pending, Yoder obtained a certified statement of evidence from the trial court demonstrating that he raised 404(b) objections during those conferences.

5

The trial court is afforded wide discretion in ruling on the admissibility and relevancy of evidence. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). We review evidentiary decisions for an abuse of discretion and reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.*

Admission of evidence of other acts of misconduct is governed by Indiana Evidence Rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

This rule was designed to prevent a jury from assessing a defendant's present guilt on the basis of past propensities. *Allen v. State*, 720 N.E.2d 707, 711 (Ind. 1999). When a trial court considers the admissibility of 404(b) evidence, it must: (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Nicholson*, 963 N.E.2d at 1100.

As is noted above, the trial court held that evidence of Yoder's participation in other fires was admissible to show plan or modus operandi. Our Supreme Court has treated modus operandi as akin to the identity exception that was incorporated into Rule 404(b). *See Thompson v. State*, 690 N.E.2d 224, 234 (Ind. 1997) ("The identity

6

exception to the general prohibition on propensity evidence is crafted primarily for 'signature' crimes with a common modus operandi."); *Davis v. State*, 598 N.E.2d 1041, 1048 (Ind. 1992) (noting that the "common scheme or plan exception" "permits proof of identity by showing the defendant committed other crimes with identical modus operandi."). For purposes of this case, we treat evidence admitted to show modus operandi as evidence of proof of identity. If the State asserts that other crimes or wrongs are admissible to prove identity, the other crimes or wrongs must be so strikingly similar that we can say with reasonable certainty that the same person committed them. *Nicholson*, 963 N.E.2d at 1100.

In the current case, Zagelmeier testified that he interrogated Yoder about other fires and that Yoder admitted to setting five. The five fires were set within the SFD's service area and all occurred within eight months of the Sauder cabin fire. All were set in a rural area. For four of the five fires, Yoder was the individual who first called 911 to report them, as he did for the Sauder cabin fire. In addition, Yoder told Zagelmeier he used matches to light four of the five fires. The means by which the Sauder cabin fire was ignited could not be determined, but Vogely told the jury that for intentionally set fires, investigators generally do "not find the obvious ignition source, because a lot of times it has fled the scene along with the individual that has cause[d] the fire . . . such as you[r] lighters, your matches, a torch." Tr. p. 390.

We conclude that the five fires, as described in Zagelmeier's testimony, were strikingly similar to the Sauder cabin fire, and it can be said that Yoder's commission of those fires could cause a person to conclude with reasonable certainty that he also started

7

the Sauder cabin fire. Next, we balance the probative value of the evidence against its prejudicial effect. Given that the identity of the Sauder cabin arsonist was the crucial dispute at trial, we conclude that the probative value of the evidence of a modus operandi or signature crime was so strong as to outweigh any prejudice. Consequently, the trial court did not abuse its discretion in admitting Zagelmeier's testimony about the five fires that Yoder admitted setting. *See Allen*, 720 N.E.2d at 712 (determining that evidence of Allen's prior sexual assaults was admissible because they were strikingly similar to the crime at issue and served to prove identity, which was a crucial issue at trial).

Next, we turn to Vogely's testimony. He first provided a general description about the nature of fires and how they are investigated. Vogely said the SFD had initially asked him to investigate the Sauder cabin fire but later canceled the request because Bushee had arrived at the scene. He further explained the SFD asked him to investigate the Cook fire, which occurred nine days after the Sauder cabin fire. Tr. p. 398. The Cook fire involved an unused shed. Vogely noted that there were two points of origin and concluded that the fire was incendiary, or intentionally set. Vogely did not directly or indirectly implicate Yoder in setting that fire. Finally, he testified that he had helped the police to review recent fires in the SFD's service area and determined that they had experienced an "abnormal" amount of fires. *Id.* at 401. However, Vogely did not explicitly or implicitly implicate Yoder in any of those fires either. Indeed, he did not mention Yoder by name on direct examination or cross-examination, but rather described the course of his investigation. At best, this evidence raised a faint inference of Yoder's involvement in those fires, and evidence that creates a mere inference of prior or

8

subsequent[2] bad conduct does not fall within the purview of Rule 404(b). *Dixson v. State*, 865 N.E.2d 704, 712 (Ind. Ct. App. 2007), *trans. denied*. The trial court did not abuse its discretion by admitting Vogely's testimony.

Next, Yoder asserts that several other witnesses also testified about other fires, and although he did not object to their testimony, he claims the trial court committed fundamental error by admitting that evidence. A claim waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that fundamental error occurred. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Id.* This exception is available only in egregious circumstances. *Id.*

Here, Shull testified about his involvement in the Sauder cabin fire and the Cook fire. Next, he told the jury about seven other fires in the area and the extent of Yoder's involvement in fighting those fires. Yoder had admitted to committing five of the nine fires Shull described. In addition, Kevin Crowl, the former chief of the SFD, testified in more detail about one of the fires Shull described, and Yoder's involvement in fighting that fire. Yoder had admitted setting the fire that Crowl described to the jury. Angela Grogg, who was the Deputy Director for DeKalb County's emergency dispatch system, testified about Yoder's calls to 911 reporting several fires. Yoder admitted that he had set

---

[2] The Cook fire occurred after the Sauder cabin fire. However, the 404(b) analysis is employed when determining the admissibility of evidence of subsequent bad acts as well as prior bad acts. *Southern v. State*, 878 N.E.2d 315, 322 (Ind. Ct. App. 2007), *trans. denied*.

9

some, but not all, of the fires that he reported to 911. Finally, Bushee testified that he was present at several fires, some of which Yoder admitted setting.

We have already determined that the five fires that Yoder admitted setting were properly admitted to show identity, so Shull, Crowl, Grogg, and Bushee's testimony about those fires was not fundamentally erroneous. However, Yoder denied setting three other fires, and no other evidence was admitted at trial to tie Yoder to those three fires.[3] For evidence of an extrinsic offense to be admissible under the modus operandi exception to prove identity, there must be evidence that the defendant committed the extrinsic offense. *Brown v. State*, 577 N.E.2d 221, 227 (Ind. 1991). Nevertheless, given the strong evidence of Yoder's involvement in the Sauder cabin fire and the evidence of the five fires he admitted setting, we cannot say that informing the jury about the three fires that he denied setting was a blatant violation of basic principles that gave rise to substantial harm and deprived Yoder of fundamental due process.

Yoder also contends that fundamental error occurred because testimony about the other fires was confusing. We disagree. The State provided the jury with a chart, State's Exhibit 4, that set forth the date, location, and nature of each of the nine fires, as well as whether Yoder called 911 about each fire and whether he admitted igniting it. The risk of confusion was not so substantial as to amount to fundamental error.

Finally, Yoder claims the trial court fundamentally erred by failing to give the jury a limiting instruction that evidence of other fires was only admissible to prove plan or

---

[3] Furthermore, the State does not defend the admission of evidence about those three fires, focusing in its Appellee's Brief on the five fires that Yoder admitted setting.

10

modus operandi. Given the evidence related to the Sauder cabin fire as well as the evidence of the five other fires that Yoder admitted setting that tend to prove identity through modus operandi, we cannot conclude that the absence of a limiting instruction here was a blatant violation of basic principles. *See Allen v. State*, 925 N.E.2d 469, 479 (Ind. Ct. App. 2010) (finding no fundamental error in the trial court's failure to give a limiting instruction on the use of 404(b) evidence because the evidence was highly probative and other evidence supported the verdict), *trans. denied.*

The trial court did not commit reversible error in admitting evidence of other fires.

## II. ADMISSION OF FIRE INVESTIGATOR'S OPINION TESTIMONY

At trial, Bushee stated that the fire at the Sauder cabin was caused by ignition, which he defined as something other than a naturally-occurring or accidental cause. Yoder argues that the trial court should not have admitted Bushee's opinion because he was not qualified to state an opinion on the cause of the fire and because Bushee's opinion was not based on reliable scientific standards.[4]

Yoder did not object to Bushee's opinion testimony and thus must show fundamental error. The fundamental error exception applies only when the error constitutes a blatant violation of principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa*, 938 N.E.2d at 694.

---

[4] Yoder did not challenge Bushee's qualifications in his Appellant's Brief, but the State questioned in its Appellee's Brief whether Bushee was an expert witness or a skilled lay witness, which opened the door for Yoder to address Bushee's qualifications in his Reply Brief.

11

Admission of expert testimony is governed by Indiana Evidence Rule 702, which provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Two requirements must be met in order for a witness to qualify as an expert: (1) the subject matter must be distinctly related to some scientific field, business, or profession beyond the knowledge of the average person and (2) the witness must have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact. *Taylor v. State*, 710 N.E.2d 921, 923 (Ind. 1999).

There is no specific test which must be applied when determining whether expert scientific testimony is based upon reliable scientific principles. *Turner v. State*, 953 N.E.2d 1039, 1050 (Ind. 2011). Federal courts use the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Indiana courts are not bound by *Daubert* when analyzing evidence under Indiana Evidence Rule 702(b), but we find the principles stated in that case to be helpful. *Turner*, 953 N.E.2d at 1050. Thus, in determining whether evidence is admissible under Rule 702(b), we may consider whether the theory or technique can be and has been tested, whether the theory has been subjected to peer review and publication, whether there is a known or potential error rate, and whether the theory has been generally accepted within

the relevant field of study. *Id.* at 1048 (citing *Daubert*, 509 U.S. at 593-94). Our Supreme Court's adoption of Rule 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence. *Id.* at 1050.

Bushee has been a volunteer firefighter with the SFD since 1969. He went to numerous firefighter schools and obtained a Master Firefighter Certification in tactics, among other certifications. In addition, Bushee is certified in fire investigation by a national firefighting entity. Bushee testified that he went to the Sauder cabin after the fire and examined the cabin and its surroundings. He considered standards set by the "NFPA," a national fire investigation organization. Tr. p. 494. Under those standards, which the parties agree are generally accepted by fire investigators nationwide, he testified that he was required to determine whether the fire was accidental, natural, or incendiary, and he concluded that the fire was incendiary.

Based upon this evidence, we cannot say that the admission of Bushee's testimony as expert witness evidence, or even as skilled lay witness evidence under Indiana Evidence Rule 701,[5] was a blatant violation of basic principles that rendered Yoder's trial unfair and deprived him of fundamental due process. Bushee was qualified to express an opinion on the topic by virtue of his education and training, and his opinion was based on principles widely used in the fire investigation field. Yoder argues that Bushee failed to comply with NFPA guidelines, but any differences between the guidelines and the

---

[5] That rule provides, "If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."

manner in which Bushee applied them go to the weight of the evidence, not its admissibility. We find no fundamental error.

### III. PROSECUTORIAL MISCONDUCT

Yoder claims that his trial was unfair because the prosecutor made false and misleading statements during voir dire, presentation of evidence, closing arguments, and sentencing. Yoder did not object to any of the acts he seeks to challenge on appeal, so he concedes that our standard of review is for fundamental error. A party's failure to present a contemporaneous objection asserting prosecutorial misconduct precludes appellate review of the claim unless the misconduct amounts to fundamental error. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). Thus, a defendant who wishes to argue prosecutorial misconduct despite waiver must establish the grounds for prosecutorial misconduct and the additional grounds for fundamental error. *Id.* at 818.

In reviewing a claim of prosecutorial misconduct, a court first determines whether the prosecutor engaged in misconduct and then determines whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which the defendant should not have been subjected. *Stephenson v. State*, 742 N.E.2d 463, 482 (Ind. 2001). The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's verdict, not the degree of the impropriety of the conduct. *Id.* For prosecutorial misconduct to constitute fundamental error, it must make a fair trial impossible or constitute a clearly blatant violation of basic and elementary principles of due process. *Booher*, 773 N.E.2d at 817.

14

## A. VOIR DIRE

The function of voir dire examination is not to educate jurors, but to ascertain whether jurors can render a fair and impartial verdict in accordance with the law and the evidence. *Coy v. State*, 720 N.E.2d 370, 372 (Ind. 1999). Yoder first asserts that the prosecutor inflamed potential jurors against him by referring to murder and terrorism, crimes which had nothing to do with this case. During a discussion of motive, the prosecution told voir dire panelists the following:

> Well, there are some recognized reasons, common reasons for arson. Sometimes it's vandalism. Some people just like to destroy stuff. Sometimes it's thrill seeking. It can be thrilling. Sometimes it's revenge. Get even with somebody. Or to hide a crime. It's not unheard of to find a murdered body in a burned building. Nice way to get rid of a body. Uh, and of course, extremism, which might've been the intention thing like terrorism. What kind of people do you think commit arson?

Tr. p. 213. This statement was supported by the evidence presented at trial, because Vogely testified as follows for the possible motives for arson: "[O]ur reference guide that we use, NFPA 921, . . . lays them out as vandalism, extremism, excitement, crime concealment, profit or revenge." *Id.* at 396. Furthermore, we note that the question of whether the Sauder cabin fire was intentionally set was disputed at trial, and evidence as to motive would help the jury decide whether the fire was accidental or incendiary. Consequently, even if the prosecutor's statement placed Yoder in grave peril, we cannot say that it was a blatant violation of basic and elementary principles of due process.

Next, Yoder argues that the State attempted to shift the burden of proof by stating that it was not required to prove motive, but motive would be a useful factor in deciding

15

the case. Yoder complains of the following statement by the prosecutor to potential jurors:

> See, and we spend a lot of time on those non-element points, because it helps us understand the whole situation. But sometimes they can't be proven beyond a reasonable doubt. If they're not an element, it doesn't matter. It only matters if it makes you doubt that you understand the elements correctly. Like exactly what time it was or what was somebody wearing and things like that. Sometimes that tells you that somebody really knows what they're talking about. But it's not an element that you have to know beyond a reasonable doubt. How do you feel about that . . . ?

Tr. p. 272. The prosecutor's statement accurately described the law: the State is only required to prove the elements of the offense, and not motive, beyond a reasonable doubt. Yoder was not placed in grave peril by this statement.

## B. PRESENTATION OF EVIDENCE

Yoder claims that the prosecutor knowingly presented false evidence to the jury. Specifically, he states that Bushee falsely described the professional standards that govern fire investigation, and the prosecutor presented the testimony without correcting or clarifying it. We disagree. During his direct testimony, Bushee told the jury that he did not see any accidental or natural causes for the Sauder cabin fire, so the fire was incendiary, or intentionally set. On cross-examination, Yoder pointed out that Bushee had said in his deposition that he could not tell whether the fire was intentional and stated at that time that the origin was undetermined. However, in response to a question from the jury, Bushee clarified that a few weeks before trial, he learned from Vogely that the NFPA standards had been updated. He further stated that under the updated standards, he had to choose among accidental, natural, or incendiary causes for the fire, and that an

16

incendiary cause fit the evidence. Thus, Bushee did not lie on the stand, but instead changed his position prior to trial based on new information. There was no perjury, and the prosecutor did not place Yoder in grave peril by presenting Bushee's testimony on the cause of the Sauder cabin fire.[6]

On a related topic, Yoder contends that the State was obligated to inform him of Bushee's change of opinion as to the cause of the fire because it was a material change in his deposition testimony. However, even if the prosecutor was aware of the change prior to trial, we cannot say that the State's failure to supplement its discovery response amounted to a clearly blatant violation of basic and elementary principles of due process. Yoder picked up on Bushee's change in testimony at trial and impeached him using his prior inconsistent deposition testimony. There is no fundamental error.

Next, Yoder asserts that the State misrepresented evidence to the defense and the court prior to trial. Specifically, at a pre-trial suppression hearing the State played a video recording of the police interrogating Yoder, and the State had not previously disclosed the first half-hour of the tape, which showed the officers discussing strategies for the interrogation. It is unclear how Yoder was harmed by the State's failure to disclose the existence of the first half-hour of the tape prior to the hearing. Yoder was made aware of the undisclosed portion of the recording at the hearing and could have reviewed it prior to trial. We find no error, let alone fundamental error.

---

[6] Yoder argues that Bushee's testimony was also false because he misstated NFPA standards. However, the NFPA standards were not admitted into evidence, so we have no basis to assess this claim. Bushee's testimony about NFPA standards did not precisely align with Vogely's testimony, but those differences do not establish that Bushee lied.

17

Yoder also argues that the prosecutor committed misconduct by questioning a witness as to facts not in evidence. The prosecutor, when questioning Grogg about the dates of Yoder's calls to 911, asked her to refresh her recollection using incident reports. The prosecutor then stated, "Which dates, and they're not all in there. The dates that you have, tell me the dates that they refresh your recollection on." Tr. p. 521. Grogg responded, "6-24 of 09, August 30th of '09, 9-28 of '09 and 11-26 of '09; 1-23 of 2010." *Id.* Yoder claims the prosecutor's reference to dates that were "not all in there" was a reference to fires that were not otherwise discussed at trial. We disagree. According to State's Exhibit 4, Yoder also called 911 to report a fire on April 8, 2009, so the prosecutor could have been referring to the April 8, 2009 call, which was in already in evidence. The prosecutor did not place Yoder in grave peril.

## C. CLOSING ARGUMENTS

Yoder asserts that the prosecutor encouraged jurors to ignore the presumption of innocence and go with a "gut feeling" about the case. Appellant's Br. p. 32. He challenges the following statement by the prosecutor:

> We talked earlier in this case about deliberations. You see what I want, you've seen the tape. But I make a suggestion. When you go back there and maybe pick the foreperson, you also immediately write down to yourself what your gut tells you. Guilty, innocent. Did he do it; didn't do it. In fact I would, did he do it; didn't he do it. When you get in to guilty, innocent, we get dragged down into possibilities and so on. Go, write down your gut. How do you feel about it? You fold that piece of paper up, save it for later. Because after you start talking about it, dicing it up and slicing it, which you should do to evaluate the evidence, you're gonna forget your sense of things and how it all came to you. And your sense of things is important too. Don't forget that. You wouldn't wanta reach a conclusion in five minutes. That would be inappropriate. But you don't wanta ignore what having sat, having been sitting here the last two days, everything

that's come to you and the fact that you have common sense and you know it when you see it. You don't wanta ignore that either. So write it down so you don't forget it and then dice it up. And then compare back and forth. After you've diced it up, see how everybody else felt. Instincts can be wrong. But you can also talk yourself into something goofy by slicing and dicing too much and forgetting how you felt about it in the first place.

Tr. p. 560. Yoder also challenges the prosecutor's following statements on rebuttal:

You see the proof is in now. And you do need to listen to the Judge's instructions. But that presumption of innocence, you have the proof now. As soon as the instructions are read, it's time to decide if the presumption is true or not. And your gut always knows what the rest of you is gonna have to argue and debate and slice up a little bit to be sure in your own mind you were right. That he's guilty of committing arson when he torched the Sauder house.

*Id.* at 572. The prosecutor's recommendation that the jurors, as individuals, consider Yoder's guilt or innocence at the beginning of deliberations was not fundamentally erroneous. She noted that they should decide whether he did or did not do it, thus encouraging them to keep an open mind. Furthermore, the prosecutor did not ask the jurors to abandon the presumption of innocence. To the contrary, she merely stated that their deliberations would be the point at which the evidence tests the presumption. These statements were not clearly blatant violations of basic and elementary principles of due process.

Next, Yoder contends that the prosecutor ascribed motives to him that are not supported by the evidence and only served to inflame the jury against him. Specifically, the prosecutor said Yoder started fires on nearby properties to "get a nice big hug later, when [he saved] friends and family." Tr. p. 548. This statement was supported by the evidence because Yoder started fires in the SFD's service area, where he would be able to

19

fight fires for his neighbors. Furthermore, when the Sauders went to their cabin after learning of the fire, Martha Sauder encountered Yoder, who she knew from church, and they hugged.

Yoder also complains that the prosecutor encouraged the jury to speculate about his motivations as follows:

> When he lights them himself, he gets to respond in the fire truck. Think about the lights and siren. Lights and siren going. That's gotta be kinda thrilling. And, ultimately of course, he gets to fight the fire. That's got to be thrilling. One of the jurors in voir dire said, fun. Hate to call it fun if the fire's destructive. But I imagine there's some fun in it. You get to save your friends and family, be a hero. And you get to play with fire. When you light it, you get to play with it. Most humans like fire. Some of 'em to a pathological extent. But you light it yourself, you get to play with it. And there there's the adrenaline rush of coming up with the plan.

*Id.* at 549-550. However, Zagelmeier told the jury that when he asked Yoder why he set the five fires, Yoder told him, "I was just an idiot at the time." *Id.* at 538. It is a fair interpretation of the evidence to argue that Yoder considered himself "an idiot" because he was caught up in the excitement of starting fires and helping friends and family. The prosecutor's comment did not place Yoder in grave peril.

Finally, Yoder argues that the prosecutor told the jury that "no innocent person ever confesses to a serious crime." Appellant's Br. p. 34. This is a misreading of the record. During a discussion of the other fires Yoder admitted setting, the prosecutor told the jury, "First of all, unlike all other people out there, he's got a motive or intent to burn things. And we know that at least the five times that he confessed to starting fires. How many people in this room other than Lee Yoder do you think would have to 'fess up to starting a fire on anybody else's property other than their own?" Tr. p. 551. Rather than

20

asserting that innocent persons never confess to crimes, the prosecution was simply arguing to the jury that they could consider the five fires he admitted setting in determining his motive and intent. We cannot conclude that this statement amounted to prosecutorial misconduct, let alone fundamental error.

## D. SENTENCING HEARING

Yoder argues that the prosecutor lied to the judge at sentencing. To address this argument, some background is necessary. Earlier in the case, Yoder had agreed to plead guilty, and he admitted under oath to committing all three of the offenses with which he had originally been charged. However, at a subsequent hearing Yoder denied committing the crimes and withdrew his guilty plea. Yoder was not under oath when he retracted his plea. As a result, the trial court allowed Yoder to withdraw his plea, and the State charged Yoder with perjury for claiming responsibility for the offenses under oath.

At sentencing, the prosecutor told the judge that Yoder had been under oath when he attempted to retract his guilty plea. He was not under oath, and Yoder asserts that the prosecutor's statement was a deliberate falsehood. There is no evidence that the prosecutor intentionally lied to the court about the matter. In any event, the prosecutor's isolated misstatement did not render a fair sentencing hearing impossible. There is no fundamental error.

## E. CUMULATIVE EFFECTS

Yoder contends that all of the prosecutor's missteps, taken together, amount to prosecutorial misconduct and fundamental error. We have concluded that none of Yoder's claims of prosecutorial misconduct require reversal. Many of them do not

21

amount to prosecutorial misconduct, let alone fundamental error. Trial irregularities which, standing alone, do not amount to error cannot gain stature of reversible error when taken together. *Chapman v. State*, 556 N.E.2d 927, 932 (Ind. 1990) (rejecting Chapman's claim of cumulative prosecutorial misconduct). Consequently, Yoder's claim of cumulative reversible error must fail.

## IV. SUFFICIENCY OF THE EVIDENCE

Yoder argues that his arson conviction must be reversed because: (1) the State did not prove the Sauder cabin fire was intentionally set; (2) the State did not prove he set the fire; and (3) the State did not prove the cabin was a dwelling for purposes of the governing statute.

When an appellant challenges the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Joslyn v. State*, 942 N.E.2d 809, 811 (Ind. 2011). We consider only the probative evidence and reasonable inferences supporting the verdict, and we will affirm if the evidence and reasonable inferences could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.* Arson is almost always subject to proof solely by circumstantial evidence. *Bald v. State*, 766 N.E.2d 1170, 1174 (Ind. 2002).

In order to convict Yoder of arson as a Class B felony, the State was required to prove beyond a reasonable doubt that (1) Yoder (2) by means of fire, explosive, or destructive device (3) knowingly or intentionally (4) damaged (5) a dwelling of another person (6) without the other person's consent. *See* Ind. Code § 35-43-1-1.

22

We start with whether the fire was intentionally set. The State has the burden of showing that a fire was from other than accidental causes, and absent such a showing a fire will be presumed to be accidental. *Wise v. State*, 719 N.E.2d 1192, 1200 (Ind. 1999). Bushee, a trained fire investigator, testified that the fire was ignited, meaning that it was not caused by nature or by an accident. He noted that there was no electrical or gas utility service to the cabin. Instead, it was heated by a wood burning stove, but the burning chair was not near the stove and the stove showed no signs of fire. Furthermore, Bushee ruled out a lightning strike or other natural causes. This is sufficient evidence that the fire was intentionally set. Yoder argues that Bushee misapplied the governing fire investigation standards, but his argument is a request to reweigh the evidence, which we cannot do.

We next turn to the question of whether the State proved beyond a reasonable doubt that Yoder set the fire. Yoder was at the scene of the fire before he called for assistance. When Shull told Yoder to check whether the cabin's windows were black, Yoder gave an affirmative answer within thirty seconds while Shull remained on the line. In addition, Yoder told Shull that he became aware of the fire because he smelled smoke at his house, which was over 2000 feet away. However, when Shull drove up to the cabin he could not smell any smoke. The fire was small, only giving off as much smoke as a campfire. A reasonable jury could reasonably infer that Yoder lied about discovering the fire by smelling smoke from his house.

Next, Shull thought it odd that Yoder called him about the fire instead of calling 911 directly. Investigators later learned that Yoder had called 911 three times in the six

23

months prior to the Sauder cabin fire. Furthermore, Zagelmeier told the jury that Yoder had admitted that he had set a fire near Shull's house in the months leading up to the Sauder cabin fire so that Shull would see it and call 911. A reasonable jury could reasonably infer that Yoder called Shull about the Sauder cabin fire in hopes that Shull would call dispatch for him, thereby partially concealing that he had discovered the fire.

In addition, when Yoder called 911 on Shull's orders, he first asked whether he was speaking with DeKalb County's emergency dispatch. Given that he had called 911 three times recently, it is difficult to accept that he did not know who he was calling. Furthermore, although Yoder identified himself as an SFD firefighter and provided his firefighter number, he hung up, contrary to the dispatcher's request, before providing any additional information. In addition, he told the dispatcher that his chief "[said] that it's a possible structure fire." Tr. Ex. Vol., State's Trial Ex. 6. When Yoder called back to correct the address he had provided, he only provided his name when the dispatcher requested it. A reasonable jury could reasonably infer that Yoder was attempting to minimize his involvement in the fire.

Finally, Yoder admitted setting five other fires, which are so similar to the Sauder cabin fire that they exhibit a modus operandi and tend to prove identity. Based upon all of this evidence, there was sufficient evidence that Yoder set the Sauder cabin fire.

Next, we turn to whether there is sufficient evidence that the cabin was a dwelling for purposes of Indiana Code section 35-43-1-1. At the time of this offense, a dwelling was defined as: "A building, structure, or other enclosed space, permanent or temporary,

24

movable or fixed, that is a person's home or place of lodging." Ind. Code § 35-41-1-10 (1983) (subsequently recodified as Ind. Code § 35-31.5-2-107 (2012)).

In this case, the Sauders used the cabin for recreational purposes. They spent the night there periodically and furnished it with beds, chairs, and a cooking stove. The cabin had a wood burning stove for heat. Thus, the Sauders exercised a right of dominion over the property and continued to stay at the cabin from time to time. This evidence is sufficient to establish that the building was a "dwelling" for purposes of the arson statute. *See Byers v. State*, 521 N.E.2d 318, 319 (Ind. 1988) (affirming that an apartment was a "dwelling" for purposes of a burglary charge where the renters maintained personal property at the apartment and intended to return there, even though they were not sleeping at the apartment at the time of the crime).

The evidence is sufficient to sustain Yoder's arson conviction.

CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

BAKER, J., and KIRSCH, J., concur.